IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARY DEELY,                          )
                                     )
                                     )   CIVIL ACTION NO. 05-0835
                                     )
        Plaintiff,                   )   Judge Lancaster
                                     )
                                     )   Magistrate Judge Caiazza
        v.                           )
                                     )
                                     )
                                     )
                                     )
JO ANNE B. BARNHART,                 )
Commissioner of                      )
Social Security,                     )
                                     )
        Defendant.                   )

## REPORT AND RECOMMENDATION

### I. Recommendation

Acting pursuant to 42 U.S.C. § 405(g), Mary Deely ("Deely") or ("the Claimant") appeals from a April 29, 2005 final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability and supplemental security income benefits. Cross-motions for summary judgment are pending. It is respectfully recommended that the Claimant's motion (Doc. 6) be granted, and that the Commissioner's motion (Doc. 8) be denied.

### II. Procedural Background

On May 15, 2001, Mary Deely filed an application for Social Security Disability, alleging that she had been disabled since

-1-

August 11, 2000 as a result of fibromyalgia, diabetes, hypothyroidism, and chronic fatigue syndrome. (R. 97-99). This claim was denied in a decision dated July 27, 2001. Deely requested a hearing, which was held before an Administrative Law Judge("ALJ") in Pasadena, California on August 11, 2003.[1] (R. 379). Deely, who was represented by counsel, testified, as did a medical expert and a vocational expert. During the course of the medical expert's testimony, the ALJ found it necessary to order a psychological evaluation of Deely's cognitive function. The hearing was suspended pending the assessment.

Deely's hearing resumed on June 22, 2004.(R. 477). The ALJ heard the testimony of a psychological expert and a second vocational expert. In a decision dated September 24, 2004, the

---

[1]Although Deely lived in California at the time of her hearing, she now resides in Pittsburgh. There is a dearth of authority pertaining to whether final decisions of the Commissioner should be reviewed in accordance with the law of the jurisdiction in which the ALJ sat, or in accordance with the law applicable in the jurisdiction where the appeal was filed. Deely draws the court's attention to what appears to be the only published opinion addressing this issue. In Mickeal v. Apfel, 16 F.Supp.2d 1329, 1331 (D. Kan. 1998) the District Court held that "final decisions of the Commissioner are reviewed under the law of the circuit where the district court sits." In reaching this conclusion, the district court followed an unpublished opinion issued by the Court of Appeals for the Tenth Circuit, Smith v. Shalala, 5 F.3d 547(10th Cir. 1993),(finding that Tenth Circuit law governed although administrative hearing took place in Ninth Circuit; conflict of laws principles do not control where federal court applies federal law). The court need not decide this issue, because the standard of review articulated by the Court of Appeals for the Ninth Circuit is the same as that applied by the Court of Appeals for the Third Circuit. Compare Glass v. Barnhart, 109 Soc. Sec. Rep. Serv. 347 (9th Cir. 1996) (stating that ALJ's decision will be set aside only where decision is not supported by substantial evidence in the record as a whole) with McCrea v.Comm'r of Soc. Sec. ,370 F.3d 357 (3d.Cir. 2004)(same).

ALJ concluded that Deely was able to return to her past relevant work and, therefore, was not disabled. (R. 15 -24).

Deely's request for review was denied by the appeals council on April 29, 2005, making the opinion of the ALJ the final decision of the Commissioner. (R. 8-10) This appeal followed. Cross motions for summary judgment are pending.

### III. <u>FACTUAL HISTORY</u>

At the time of the hearing, Deely was a fifty-nine year old woman who had commpleted high school and earned a nursing dipoloma certifying her as a registered nurse.(R. 384). Her relevant work history dates from 1989 when she managed a utilization review department, and conducted quality management. She was also a case manager, and a medical staff quality and utilization review coordinator until she became disabled on August 11, 2000. (R. 169). Deely alleges that she was forced to leave her job because of extreme fatigue and deficits in her short term memory.(R. 394).

It is undisputed that Deely was diagnosed with fibromyalgia in 1989. The medical records submitted to the court date from 1996, when Deely began seeing her primary treating physician, Dr. Gary Brown. In February 1996, Dr. Brown noted that Deely suffered from fibromyalgia, chronic fatigue syndrome, depression and a thyroid disorder. (R. 346). At Deely's examinations, he consistently noted that she complained of fatigue and depression.

-3-

In May 1997, he prescribed Paxil in an attempt to alleviate her symptoms. (R. 340).

In April 1999, Dr. Brown suggested that Deely see rheumatologist, Dr. Thomas J. Romano. <u>Id.</u> Dr. Romano's report dated April 20, 1999, indicates that he ordered lab tests to rule out systemic disease such as lupus. (R. 232). Dr. Romano suspected that the tests would be negative, expressing his opinion that Deely suffered from "well controlled" fibromyalgia. (R. 333). During Dr. Romano's examination, Deely was sensitive to nine of eighteen pressure points associated with fibromyalgia. <u>Id.</u> In a report dated May 24, 1999, Dr. Romano confirmed that Deely's lab tests were normal, and that he would attempt to increase her energy by adjusting her dosage of Paxil. Although Deely did not see Dr. Romano regularly, she continued to see Dr. Brown as often as she had before, about every three months.

In December 2000, Deely reported to Dr. Brown that the Ritalin he had prescribed helped her remain alert, but that she still had trouble holding her head up. In March, she was still profoundly weak, not able to arrive at work before noon, bloated, and suffering from abdominal tenderness and intradermal lumps. Dr. Brown again recorded that she suffered from fibromyalgia and chronic fatigue syndrome. (R. 197). Deely next saw Dr. Brown in June 2000 in order to discuss lab test results. (R. 241). No abnormalities were noted. Three days before the alleged date onset of her disability, Deely kept an appointment with Dr.

-4-

Brown, telling him that she was experiencing severe fatigue, sleeping almost constantly, and missing many days of work. In September, Dr. Brown recommended that Deely try acupuncture, yoga or meditation, and exercise as tolerated. (R. 240). The record of a December 2000 appointment is cursory; Dr. Brown did not write a summary of the visit.

When she first saw Dr. Brown in 2001, Deely reported that the Ritalin increased her alertness and her ability to accomplish more at home. Nonetheless, she complained of weakness and severe fatigue. (R. 239). By the next visit, Deely had improved a bit, again reporting that the Ritalin allowed her to be more awake and functional. She told Dr. Brown, however, that she continued to fall asleep often during the day. (R. 238). In July 2001, Deely reported feeling better, and told Dr. Brown that she was doing some yoga. (R. 232).

In the same month, Deely underwent an internal medicine consultation conducted at the request of the Department of Social Services. Dr. Sourehnissani prepared a multi-page report. (R. 199-203). Deely's chief complaints were identified as diabetes, hypothyroidism, fibromyalgia, and chronic fatigue syndrome. Deely told the doctor that she did not take Glucophage, her diabetes medication, as directed, but was symptom-free and did not have a history of diabetes-related complications. She reported that "she felt very weak, was not refreshed after a night's sleep, lacked concentration, and had a very poor memory

-5-

that she attributed to the fibromyalgia and chronic fatigue syndrome."(R. 199). The doctor found trigger point tenderness over Deely's sternocleidomastoid, her lower anterior neck, and her upper and lower rhomboid. (R. 202). Dr. Sourehnissani summarized his medical findings as follows:

>Objectively the patient was found
>to have normal vital signs. On
>physical examination she was noted
>to have some trigger point tenderness
>as mentioned. The rest of the physical
>examination did not reveal any
>significant findings however patient
>seemed depressed and it was recommended
>that she follow up with a psychiatrist
>in that regard.

(R. 203).

A Physical Residual Function Capacity Assessment was completed in July 2001 by medical consultant, Dr. Cohenzadeh.(R. 205). Based on his review of medical records alone, he concluded that Deely suffered from diabetes with no end organ involvement and fibromyalgia with some tender points. (R. 206). Based on this review, he concluded that Deely was unlimited in her ability to work.

In October 2001, Dr. Brown saw Deely, noting that she had applied for disability, and that her attorney would like for her to see Dr. Romano for an updated evaluation. (R. 230). Dr. Romano examined Deely in November 2001. He wrote:

>On exam, I see many of the tender points
>Of fibromyalgia. I see nothing to suggest
>a systematic rheumatic disease. Her physical

> exam is really unchanged from my last exam
> Of April 1999. It may be that this patient's
> fibromyalgia has progressed to the point
> where she is indeed eligible for social
> security disability. I will leave her
> return with me open.

(R. 228). About three weeks later, Dr. Romano completed a

Fibromyalgia Residual Functional Capacity Questionnaire. He

reported seeing Deely four times. She met the American

Rheumatological criteria for fibromyalgia, experiencing

tenderness at each of the eighteen identifying trigger points. He

stated that Deely suffered from the following symptoms typically

associated with fibromyalgia: multiple tender points,

nonrestorative sleep, chronic fatigue, morning stiffness, muscle

weakness, numbness, and tingling, Sicca symptoms,[2] Raynaud's

Phenomenon,[3] dysmenorrhea, breathlessness, subjective swelling,

irritable bowel syndrome, frequent severe headaches, female

urethral syndrome, vestibular dysfunction, temporomandibular

joint dysfunction, anxiety, depression, hyperthyroidism, and

chronic fatigue syndrome.( R. 214-15). He did not find Deely to

be a malingerer, and expressed the opinion that emotional factors

---

[2]Sicca symptoms include "chronic and extreme dryness of the mouth and esophagus which causes difficulty swallowing." Hadix v. Caruso, No. 4-92-CV-110, 2005 WL 2671289 (W.D. Mich. October 19, 2005)

[3]Raynaud's Phenomenon is defined as a "spasm of the digital arteries, with blanching and numbness or pain of the fingers, often precipitated by cold. Fingers become variably red, white, and blue." Stedman's Medical Dictionary 1365 (27th ed.2000)(cited in Calhoun v. Barnhart, No. 025212, 2003 WL 23033022 at *2 n.1, (10th Cir. December 30, 2003)).

played a role in the severity of her symptoms. According to Dr. Romano, Deely suffered constant pain in the lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, arms, hands, fingers, hips, legs, and knees, ankles, and feet. (R. 215). He also indicated that this pain could be precipitated by changes in the weather, cold, fatigue, movement or overuse, a static position, or stress. He found that Deely was severely limited in her ability to deal with work stress, and could not satisfy the physical demands of any job. (R.217-18). Dr. Brown saw Deely twice in April and once in May 2002. (R. 218, 219,220). He noted that she was still disabled due to chronic fatigue and fibromyalgia.

### IV. <u>The Administrative Hearing</u>

### A. <u>Part One</u>

The first part of the hearing was held August 11, 2003. Deely was asked to describe her condition. She answered that she slept more than twelve hours each day, and had problems with balance. (R. 399). Yoga helped reduce the severity of constant pain throughout her body. She suffered severe headaches, and swelling of the face, neck, and abdomen. (R. 400-01). Standing more than ten or fifteen minutes exacerbated her pain, as did sitting for longer than twenty minutes without changing position. (R. 402). Walking for longer than five minutes caused her feet to swell. (R. 403). She experienced spasms in her chest if she

attempted to carry anything. Id. Dr Brown, her primary care physician prescribed Ritalin to help keep her alert, and Paxil for depression and pain.

Dr. David Brown, an expert in the field of rheumatology and internal medicine also testified. Based only upon a review of her records, he stated that Deely had been diagnosed with and met the CDC criteria for chronic fatigue syndrome. He identified her medically determinable impairments as fibromyalgia, diabetes, and hypothyroidism. (R. 411). He also noted evidence of a depressive order that had been treated by Deely's primary care physician. (R. 411-12). Based on the medical evidence alone, Dr. Brown concluded that none of Deely's conditions met or equaled a listed impairment, and that a person with her impairments could lift ten pounds frequently, and twenty pounds occasionally. (R. 414). Given the history of depression, the work environment should be one of low stress with height restrictions and low stress(R. 414-15).

When questioned about Deely's need for sleep, Dr. Brown testified that the need was excessive for a patient with fibromyalgia, but might not be excessive for a patient with combined depression and fibromyalgia. The pain that Deely described "would be typical in patients with fibromyalgia." (R. 415). The chest spasms described by Deely could be "a feature of the fibromyalgia." (R.416). Dr. Brown stated that complaints of cognitive deficits were also associated with fibromyalgia, but

-9-

were not always indicative of actual cognitive dysfunction.
(R. 420). He testified that whether to refer a fibromyalgia
patient for a psychological assessment of cognitive function was
a decision for the primary physician, and would not typically be
ordered unless there was some significant neurological
deterioration of clinical functions.(R. 419). Following this
testimony, the ALJ, stated that he would order a psychological
evaluation at the close of the hearing.

The final witness called at the first phase of the hearing
was vocational expert, Alex Aloia, Ph.D. Asked by the ALJ to
assume that Deely had the residual functional capacity described
by Dr. David Brown, Dr. Aloia testified that Deely would be able
to return to any of her prior work. The ALJ did not pose a
hypothetical question incorporating Deely's description of her
symptoms, stating that if she had to sleep twelve hours a day it
was clear that she could not work. The vocational expert
testified that if Deely suffered from the cognitive deficits
which she described, these deficits, too, would prevent her from
working. The hearing was continued pending results of the
psychological examination. (R. 408).

## B. **Part Two**

Deely's hearing resumed nearly a year later, on June 22,
2004. Deely, her attorney, psychological expert Glenn Griffin,
Ph.D., and Elizabeth Ramos-Brown, a vocational expert, attended.

The primary focus of this hearing was a September 3, 2003 consultative psychological report prepared by clinical psychologist, Steven Brawer, Ph.D.

For reasons not apparent in the record, Dr. Brawer did not attend the hearing. An attempt was made to secure Dr. Brawer's report, but he refused to release it to anyone who was not a psychologist. The report was released to Dr. Griffin, but at the outset of the hearing, Dr. Griffin reported that he received and had with him only raw scores for the psychological tests administered to Deely. The ALJ proceeded with the hearing, stating that he would determine at the close of the hearing whether to ask Dr. Brawer for any additional information. (R. 431).

Dr. Griffin stated that he had reviewed the record and found that it contained "very little psychological data." (R. 433). The ALJ asked whether Dr. Griffin was able to say whether Deely had a "medically determinable mental impairment[]." Id. Dr. Griffin responded that Deely had a "depressive disorder not otherwise specified", and stated that although depression is an associated feature of fibromyalgia, questions relating to fibromyalgia itself were beyond his expertise. He testified that the depressive disorder alone would impose only mild limitations on Deely's ability to work. Id.

Deely's attorney questioned Dr. Griffin about the Claimant's subjective symptoms. Dr. Griffin testified that he had not

-11-

considered subjective data; his opinion about Deely's ability to work was based only on available objective data. These data did not show that Deely had a cognitive deficit. According to Dr. Griffin, the evidence showed that Deely's memory, intellectual ability, and problem solving skills were in the average range. (R. 449).

One of the purposes of the psychological tests was to assess Deely's credibility. At two points in the hearing, Dr. Brown stated that the test results indicated that Deely was not malingering or exaggerating her subjective symptoms. (R. 442-43, 453-54). When asked how he could reconcile the conclusion that Deely was credible with psychological tests that failed to reveal a significant cognitive impairment, Dr. Griffin stated: "That area in between honest reporting and malingering I think is adequately accounted for by fibromyalgia." (R.454). Dr. Griffin concluded that there were medical conditions in the record that could cause Deely's self-described symptoms. "[T]hat would be again, the fibromyalgia, which makes you sleep all day and things like that." (R. 455). Elsewhere in his testimony, Dr. Griffin agreed that there "there is some valid basis for significant complaints here." (R. 443).

Deely's attorney drew Dr. Griffin's attention to the following statement included in the report prepared by Dr. Brawer: "[Deely] might have significant difficulties with sustaining stamina and maintaining reliable attendance." (R.

435). Dr. Griffin theorized that the limitations mentioned by Dr. Brawer possibly related to Deely's general weakness and fibromyalgia. (R. 435).

The final witness at the hearing was Elizabeth Ramos-Brown, a vocational expert. She testified that a person with Deely's residual functional capacity would be capable of returning to some of her past relevant work as a review coordinator and a hospital insurance representative. The particular job would need to be one where there was minimal stress. Each of Deely's prior jobs, as they were performed, involved a level of stress that would be intolerable given her impairments.(R. 471).

Based on the difficulty in assessing the stress associated with Deely's past relevant work, the ALJ stated that there were no "clear indicators in the vocational testimony the Claimant can return to her past relevant work" Id. He concluded that, in fact, there were indications to the contrary. Nonetheless, he asked the vocational expert to estimate the number of jobs in medical utilization review that would fit Deely's residual functional capacity. The expert stated that the need for low stress would reduce the number of jobs available in Deely's formal work by half, but that were would still be a significant number of jobs available. "Starting with the hospital insurance representative, I believe that the national economy would reflect 475,000 and the local therefore would be approximately 4700. And for the utilization review coordinator 125,000 nationally approximately

and the local would be 1200."(R. 475). The expert concluded her testimony by stating that Deely's skills could not be used outside of the medical industry. (R. 475). The hearing ended.

## V. <u>Discussion</u>

### A. <u>The Findings of the ALJ</u>

On September 24, 2004, the ALJ issued a decision in which he found that Deely was not disabled. He reached this decision by applying the sequential five step analysis set out in 20 C.F.R. § 146.920. Step One required that the ALJ determine whether the Claimant was working. This did not apply to Deely, so the ALJ moved to Step Two. At this step, a claimant must show that she has a severe impairment or combination of impairments which significantly limit the ability (physical or mental) to do basic work activities. The ALJ found that Deely suffered from diabetes, a depressive disorder not otherwise specified, fibromyalgia, and hypothyroidism and that these conditions, in combination, were severe. (R. 20). At Step Three, the ALJ concluded that none of Deely's impairments, alone or in combination, met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. At Step Four, he concluded that despite her impairments, Deely retained the residual functional capacity to return to her past relevant work. (R. 474-75). He recognized that if Deely's description of her symptoms were accepted as credible, Deely would be precluded from performing "competitive work."

-14-

### B. **Analysis**

The court has conducted a searching review of the record and finds that the ALJ's emphasis on the lack of objective evidence reflects a misunderstanding of Deely's primary impairment, fibromyalgia. His decision establishes that he did not consider the evidence as a whole. In effect, he excluded all but the objective evidence when he: (1) refused to credit the opinions of Deely's treating physicians who <u>did</u> evaluate all of the evidence; (2) ignored evidence in the record that the interaction between Deely's mental impairments and her physical impairments imposed greater limitations on her ability to function than either set of impairments alone; and (3) refused to consider Deely's subjective symptoms despite data supporting her credibility.

### 1. **The Nature of Fibromyalgia**

Disability cases which involve a diagnosis of fibromyalgia are particularly difficult; the syndrome generally is not well understood. The law, with its emphasis on precedent, does not always keep pace with advances in medical science. As a result, disability claims premised on immpairments such as fibromyalgia that are short on medical evidence and long on subjective symptoms have been viewed with suspicion.[4] This is changing.

Fibromyalgia is now regarded as a syndrome which may include

---

[4]The record establishes that although Deely suffers from diabetes, it is asymptomatic. She also suffers from hyperthyroidism, which is controlled by medication. This leaves fibromyalgia and depression as the bases for her disability claim.

a disorder of the neuroendocrine system, involving chemicals related to the perception of pain. Jusino v. Barnhart, No. CIV. A. 01-4902, 2002 WL 31371988 at * 2 n.5 (E.D. Pa. Oct. 21, 2002).

The syndrome has been described as:

> [A] chronic musculoskeletal pain disorder characterized by widespread pain of at least three months duration and pain upon palpation at multiple sites called tender points. A majority of [fibromyalgia] patients also complain of [chronic fatigue]-like symptoms including fatigue and nonrestorative sleep, and a sizable minority also report dysmennorrhea, irritable bowel syndrome, tension, migraine headache, and Raynaud's phenomenon. People with [fibromyalgia] awake unrefreshed from sleep with intensified muscle stiffness and aching, and prominent fatigue. A large subgroup of [fibromyalgia] patients experience depression and snxiety, which may exacerbate symptoms . . . .

Fred Friedberg, Leonard A. Jason, Chronic Fatigue Syndrome and Fibromyalgia: Clinical Assessment and Treatment, 67 (4) J. Clin. Psychol. 433 - 455 (2001). The cause of the disease "is unknown, there is no cure, and of greatest importance to disability law, its symptoms are entirely subjective." Perl v. Barnhart, No. 03-4580, 2005 WL 579879 at *3 (E.D. Pa. March 10, 2005)(quoting Sarchet v. Chater, 78 F.3d 306-307 (7th Cir. 1996)).


## 2. Rejection of Treating Physicians' Findings

Explaining his conclusion that Deeley was ineligible for disability, the ALJ accepted as dispositive the testimony of Dr.

David Brown, the expert rheumatologist who had reviewed Deely's medical records, but did not examine or treat her. The AlJ explained his position in one sentence: "I accept the opinion of Dr.[David] Brown, the medical expert, that the Claimant remains able to perform a range of light work. Dr. Brown had the opportunity to review all of the medical evidence and his opinion is most consistent with that evidence." (R. 23).[5]

The ALJ refused to credit the opinions of either of Deely's treating physicians. His only explanation for disregarding the opinion of primary physician, Dr. Gary Brown, was the following: "The doctor['s finding of disability] usurps the authority of the Commissioner, and relies on an impairment that I find not to be medically determinable: chronic fatigue syndrome." (R.24).

First, it is clear that when Dr. Gary Brown stated that Deeley was "disabled," he was not expressing a legal conclusion reserved to the Commissioner. He was instead expressing his medical judgment regarding the "nature and severity of Deely's impairments." 20 C.F.R. § 404.1527(d)(2). Next, the ALJ rejected Dr. Brown's opinion because the doctor attributed Deeley's disability to fibromyalgia <u>and</u> chronic fatigue syndrome. The case

---

[5]On the next page of the opinion, the ALJ makes the same point. "I accept the medical expert's assessment over that of the consultative internist and the State Agency medical consultants that the Claimant is capable of medium work. Dr. Brown specializes in the area of medicine concerned with the Claimant's primary impairment, and he was provided with medical evidence that was not available to the consultative internist or the State Agency consultants." (R. 26).

law and the medical literature establish that "[that] there is no

conflict between the diagnosis of chronic fatigue syndrome . . .

and the diagnosis of fibromyalgia . . . ." Powell v. Chater, 959

F. Supp. 1238, 1244

(C.D. Cal. 1997).

> These disabling syndromes are grouped together
> because they share a number of clinically
> important characteristics, including similar
> symptomology and demographics, a wide range of
> symptom fluctuations and disability . . . .

Friedberg et. al at 433-455. Even the Social Security

Administration "considers fibromyalgia in conjunction with

chronic fatigue syndrome, as some of the symptoms overlap[.]"

Boineau v. Barnhart, 378 F. Supp. 2d 690,694 (D. S.C. 2005).

The ALJ did not cite any medical evidence in the record or

legal authority that would justify disregarding Dr. Gary Brown's

opinion on the basis of the dual diagnosis.  Nor did the ALJ

articulate a sufficient basis for not deferring to the opinion of

Dr. Gary Brown.

The ALJ cited different,[6] but equally inadequate reasons for

disregarding Dr. Romano's report. He characterized Dr. Romano as

"disingenuous when he describe[d]" the number of times that he

had examined Deely. Dr. Romano's report stated that he had

examined Deely on "multiple occasions since May 1999." (R. 368).

---

[6]There is one similarity. The ALJ rejected the opinion of Dr.
Romano, in part because he, too, attributed Deely's inability to work
to both chronic fatigue syndrome and fibromyalgia.

-18-

Although Dr. Romano wrote four entries in Deely's medical record, a close reading shows that he examined her twice, referred to lab tests once, and noted that he had completed the first of three functional capacity forms three weeks after her last visit. Despite Dr. Romano's reference to multiple visits, the record fails to indicate that Dr. Romano was biased or that he deliberately inflated his role in Deely's care. Furthermore, it is difficult to fathom why the ALJ would reject Dr. Romano's report because he treated Deely only twice, but credit the report of Dr. David Brown, who did not see her at all.

The ALJ also found that Dr. Romano's opinion was not consistent with the objective medical evidence set out in his progress notes. The ALJ wrote: "On November 12, 2001, [Dr. Romano] had not seen the Claimant since May 1999, eighteen months earlier [but he] states that the Claimant's physical examination is unchanged since April 1999. But in April 1999, the Claimant was working and she continued to work until August 2000." (R. 23). This statement again reflects a misunderstanding of fibromyalgia.

Physical examination of a patient with fibromyalgia will "usually yield normal results." Green-Younger v. Barnhart, 335 F.3d 99, 108-09 (3d Cir. 2003). Yet, the ALJ rejected Dr. Romano's opinion because, in physical examinations eighteen months apart, he did not note any change in physical findings. The lack of objective findings in this circumstance "is no more

-19-

indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced." Id. at 109 (quoting Sarchet, 78 F.3d at 307).

Finally, the ALJ determined that while Dr. Romano found that Deely experienced cognitive dysfunction, the test results compiled by Dr. Brawer did not show an objective deficit - despite the negative test results compiled by Dr. Brawer. Dr. Griffin testified that the psychological tests consistently showed that Deely was credible, and that, notwithstanding the test results, Deely's allegations of cognitive difficulties could be the product of fibromyalgia. (R. 455). Dr. Romano's opinion with respect to Deely's cognitive deficit was not inconsistent with Dr. Brawer's report.[7]

The Court of Appeals for the Third Circuit has held time after time that "a cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Morales v.

---

[7]The ALJ also mentions a second instance where Dr. Romano's opinion is contradicted by other evidence in the record: "Dr. Romano attributes daytime drowsiness to Ritalin. But Dr. Gary Brown stated the opposite; Ritalin makes the Claimant more alert. (R. 24)(internal citations to the record omitted). This difference in the reports of the two treating physicians is trivial, and does not constitute a reasonable explanation for discounting the opinion of either.

Apfel, 225 F.3d 310, 317 (3d. Cir. 2000). In fact, relevant regulations provide that the treating physicians report is entitled to controlling weight if it is well-supported by diagnostic evidence, and not inconsistent with the other medical evidence. 20 C.F.R. § 404.1527(emphasis added)."[The] ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence." Lockley v. Barnhart, Civil Action No. 05-05197, 2006 WL 1340866 at*4 (E.D. Pa. May 16, 2006)(citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d. Cir. 1984)).

The court is convinced that the ALJ erred in failing to give controlling weight to the opinion of treating physician, Dr. Gary Brown, and in rejecting the opinion of Dr. Romano. Both doctors' opinions were based on clinical findings, and on Deely's subjective symptoms, the most important element in the diagnosis of fibromyalgia. See Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997). The opinions were fully consistent with the other medical evidence.[8]

### 3. Deely's Credibility

The court considers last the ALJ's failure to credit Deely's

---

[8]The reports of the state medical consultants consisted of physical examinations, and did not take Deely's subjective symptoms into account. Because objective evaluations alone are inadequate to assess a fibromyalgia sufferer's limitations, these reports are not substantial evidence and their findings do not undermine the opinion of Dr. Gary Brown, Deely's treating physician.

subjective account of her symptoms. The law with respect to subjective symptoms in a case involving fibromyalgia is well developed. In Ferguson v. Schweiker,765 F.2d 31, 37 (3d Cir. 1985), the Court of Appeals for the Third Circuit reiterated the governing standard regarding subjective complaints of pain: (1) subjective complaints of pain should be seriously considered, even where not fully confirmed by objective medical evidence, *see* Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981); (2) subjective pain "may support a claim for disability benefits," Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971) and "may be disabling," Smith, 637 F.2d at 972; (3) when such complaints are supported by medical evidence, they should be given great weight, Taybron v. Harris, 667 F.2d 412, 415 n.6 (3d Cir. 1981); and (4) where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence. Green v. Schweiker, 749 F.2d 1066, 1070 (3d Cir. 1984).

The ALJ gave several reasons for discounting Deely's testimony. First, he stated that her alleged symptoms were not consistent with the objective evidence. As the court has discussed at length, objective tests are largely irrelevant to a diagnosis of fibromyalgia. In any event, Deely consistently exhibited physical symptoms associated with the syndrome.

Second, the ALJ questioned Deely's truthfulness because at times she reported feeling better, and because she participated

in yoga. Although she may have felt better on some days and worse on others, she described an overall decrease in her ability to function. Furthermore, there is no evidence in the record demonstrating that participation in yoga was inconsistent with Deely's symptoms. In fact, yoga was part of the pain management regimen recommended by Dr. Gary Brown in September 2000. (R. 240). The recommendation was consistent with the medical literature. "A combination of stretching exercises, massage, relaxation techniques, and walking exercise" is recommended for patients suffering from fibromyalgia." Friedman et al. at 433-55.

Next, the ALJ found that Deely's occasional reliance on Advil and her very infrequent use of Vicodin suggested that her "aches and pains are not as severe as she alleges."[9] This assumption was not based on medical evidence. It is just as likely that Deely limited her use of these medications because they were ineffective. "Treatment [of fibromyalgia] with nonsteroidal anti-inflammatory drugs (e.g. ibuprofen) [is] not significantly associated with improved outcomes on any measure."Id. The record does not show that she took less Advil than Dr. Brown recommended, or that he ordered her to increase

_____

[9]The ALJ's assertion that Deely failed to comply with Dr. Brown's instructions because she tries to limit her intake of Vicodin is astounding. Penalizing a person who states that she cannot stay awake, and has balance problems for limiting her use of an addictive narcotic seems unreasonable. There is no evidence in the record to suggest that increasing the dosage of Vicodin would decrease the type or level of pain caused by fibromyalgia.

her intake of Vicodin, an addictive narcotic that could have affected her ability to stay awake or maintain balance. When Deely was trying to explain how she controlled her pain and why she chose the methods she did, the ALJ interrupted her, and moved to the next witness. (R. 408).

According to the ALJ, Deely's credibility was further damaged by her "failure to obtain regular and appropriate treatment." Deely did not see a rheumatologist on a regular basis, and had not consulted a psychiatrist. (R. 26). The record does not suggest that fibromyalgia patients need or benefit from frequent appointments with a rheumatologist. Similarly, the record does not show that Deely required the expertise of a psychiatrist. Her treatment was managed and coordinated by her primary care physician. There is no evidence that he failed to treat her depression or other conditions appropriately. Finally, Deely saw Dr. Gary Brown on a consistent basis while she had medical insurance. The court finds that Deely did indeed seek "regular and appropriate treatment."

The ALJ's next assault on Deely's credibility is based on her alleged lack of compliance with prescribed treatment. According to the ALJ, noncompliance was evident in Deely's failure to take diabetes medication and her infrequent use of Vicodin. The court has addressed Deely's intake of Vicodin. As for the Glucophage, it is undisputed that Deely neglected to take this medicine which was prescribed for her diabetes. She admitted

-24-

this neglect. The medical evidence shows, however, that her failure to take Glucophage did not produce the symptoms which prevented her from working. (R. 203, 206, 356, 414). Deely's diabetes was asymptomatic, and her failure to take Glucophage did not bear any rational relationship to her credibility.

Finally, the ALJ found that Deely had exaggerated her complaints of diminished ability to leave her home and cognitive dysfunction. He cited Dr. Griffin's finding that the results of psychological tests did not show that these complaints were related to her depressive disorder. (R. 26). To reach this conclusion, the ALJ ignored significant portions of Dr. Griffin's testimony. Dr. Griffin testified that depression is an associated feature of fibromyalgia, and noted repeatedly that the tests ruled out malingering. (R. 454). The data showed that Deely gave an accurate report of her symptoms. (R. 435).[10] Both Dr. Brawer and Dr. Griffin concluded that though the psychological tests were negative, fibromyalgia could cause the symptoms described by Deely. Dr. Brawer stated as much in his report. Dr Griffin agreed that Deely's description of her symptoms, including the

_____

[10] A claimant is entitled to substantial credibility if she has a record of continuous employment for a significant time. <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 409 (3d. Cir. 1979). Deely received her nursing certificate in 1986, and worked as an R.N. until the alleged onset of disability. (R. 384; 122). The record also shows that Deely continued to work even as her health declined. She worked more than ten years after she was diagnosed with fibromyalgia. When her health began to fail, she requested modified duties, then worked on a part time or per diem basis. She tried different positions or worked in specialty areas. (R. 144). Based on her work record, Deely's account of her symptoms was entitled to substantial credibility.

allegations of cognitive problems, were consistent with fibromyalgia.(R. 453-54). Dr. Griffin's full testimony supports, not undermines, Deely's credibility.

Perhaps the most surprising aspect of the ALJ's opinion is his failure to address a portion of the testimony of the medical expert, Dr. David Brown, upon whose report he relies. Dr. Brown testified that Deely's diabetes was "well controlled" (R. 414), and that ten or twelve hours of sleep per day "may not be excessive for a person with combined depression illness and fibromyalgia." (R. 415). He stated that depression and fibromyalgia are usually associated, and addressed Deely's complaints of pain all over her body, telling the ALJ that this was "typical in patients with fibromyalgia." Id.

The evidence does not support the reasons given by the ALJ for discounting Deely's credibility. He excised all of the subjective elements of the case by rejecting the reports of Deely's treating physicians, failing to address parts of Dr. Brawer's report, portions of Dr. Griffin's testimony, and Dr. David Brown's testimony relating to depression and fibromyalgia. He ignored objective evidence indicating that Deely was not malingering, embellishing, or dissembling.[11] The court concludes

_____

[11]When he found that Deely was only partially credible - without identifying which portion of her testimony he did accept - the ALJ stated,"[I] rely on the objective medical evidence to find that [Deely] retains the residual functional capacity to perform a range of light work with additional environmental limitations." (R. 26) (emphasis added).

that the ALJ did not consider the evidence as a whole, and that there is not sufficient evidence in the record to support his conclusion that Deely was not fully credible.

### 4. **Deely's Ability to Work**

The questions posed to the vocational experts - Dr. Aloia at the first hearing, and Dr. Ramos-Brown at the second - did not incorporate Deely's subjective complaints or the information contained in the reports of the treating physicians. At the first hearing, the ALJ stated explicitly that if he were to accept Deely's statement that she is only awake for two hours at a time, she could not return to her past work, and there would be no other work that she could do. (R. 424.) At the second hearing, he reached the same conclusion. The vocational expert agreed that someone who was awake for no more than two hours at a time would not be able to engage in competitive work. The ALJ also stated that he would not pose a hypothetical question incorporating the limitations found by Dr. Romano "because that was for less than sedentary." (R. 463). This evidence establishes that, in the view of the Commissioner, had the opinions of Deely's treating physicians and her description of her subjective symptoms credited - as they should have been - Deeley would be unable to perform even sedentary work.

### V. **Conclusion**

Because the court finds that the ALJ's denial of benefits

was not based on substantial evidence, it recommends that the Motion for Summary Judgment filed by the Claimant (Doc. 6) be granted, and that the Motion filed by the Commissioner(Doc. 8) be denied. The ALJ's decision should be reversed and this matter remanded to the Commissioner for the sole purpose of calculating benefits retroactive to the alleged date of onset.

June 13, 2006

/S/ Francis X. Caizazza
Francis X. Caiazza
U.S. Magistrate Judge

cc (via email):

Stanley E. Hilton, Esq.
Lee Karl, Esq.